HENRY H. DINNEEN et al. *v.* HARRISON RIDER
et al., Governing Board of Baltimore County
Metropolitan District, et al.

*Baltimore County Metropolitan District—Validity of Statute—*
*Provisions for Special Assessments—Constitutional Law.*

The whole of the Constitution is to be examined with a view
to arriving at the true intention of every part, so that effect
shall be given to the entire instrument and to every section and
clause.                                                              p. 354

Const. art. 16 (the Referendum), not applying to public local
laws except those for a county or for Baltimore City, it does
not apply to Acts 1924, ch. 539, creating the Metropolitan Dis-
trict of Baltimore County for the purpose of supplying water,
sewerage and drainage, since such district is only a part of the
county, and consequently the provision of such act making it
effective from the date of its passage does not violate the provi-
sion of that article, limiting the power of the Legislature to
make an act effective before the first of June next following.
                                                              pp. 354-357

Const. art. 3, sec. 29, providing that every law enacted by the
General Assembly shall embrace but one subject, to be described
in its title, does not require the title to give an abstract of the
contents of the act, nor need it mention the means and methods
by which the general purpose is to be accomplished.          p. 357

Acts 1924, ch. 539, creating the Baltimore County Metropoli-
tan District, for the purpose of supplying water, sewerage and
drainage, does not violate Const. art. 3, sec. 29, requiring the
title of an act to describe its subject, the various sections of that
act being germane to the subject-matter described in the title, it
enacting nothing repugnant to the title, and the title not tending
to deceive or mislead as to the scope and operation of the legis-
lation.                                                        pp. 357, 358

Such section of the Constitution does not require the title to disclose that the act is an emergency statute and effective on its passage, the time at which it becomes effective not being its subject-matter.    p. 358

In Acts 1924, ch. 539, creating the Metropolitan District of Baltimore County, for the purpose of supplying water, sewerage and drainage to the territory adjacent to Baltimore City, the provision for the newspaper publication for two successive weeks of notice of a hearing by the governing board upon the question of proposed improvements, the area to be affected thereby, and the classification of the abutting property for the purpose of assessment, constitutes due process of law as regards property assessed for such improvements, the data available to interested parties at such hearing being sufficient to inform them approximately as to the final front foot rate of assessment.    pp. 358-361

That a statute provides that the cost of a public improvement shall be paid by the abutting property owners in accordance with their respective frontage on the improvements, and makes this form of assessment operative without a hearing after notice afforded the abutting owners, is not a taking of private property without due process of law under the Fourteenth Amendment of the United States Constitution, nor under any guaranty of the Maryland Constitution.    p. 362

Where an improvement is laid on both fronts of a corner lot, it is proper to reckon the assessment on the lot on the basis of both fronts.    pp. 362, 363

An assessment for an improvement, at the rate of fifteen cents a front foot, amounting to an annual charge of $92.55, for a period of forty years, on a property assessed at $8,775, is not so clearly a flagrant abuse of legislative power as to constitute an arbitrary deprivation or confiscation of the abutting owner's rights of private property.    p. 363

Acts 1924, ch. 539, creating a district in Baltimore County for the supply of water, sewerage and drainage, does not deprive any property owners of the equal protection of the laws because it requires those already supplied with water by connections with the city system, but not those otherwise supplied, to abandon their sources of supply, nor because it provides for supervision

by the Public Service Commission of the rates charged those
obtaining water from the city, such provisions being merely sub-
sidiary and designed to adapt the measure to existing conditions,
and in effect providing classifications based upon obvious condi-
tions, which are equal and uniform in their application.

pp. 363, 364

Acts 1924, ch. 539, creating a district in Baltimore County
for the supply of water, sewerage and drainage, does not affect
any property owner's right to continue to obtain his water supply
from Baltimore City, so there is no impairment of any existing
contract between such owner and the city.                    p. 364

The rule justifying the assessment of the proportionate cost
of a public improvement, consisting of the construction of a
water main, upon abutting property, does not depend on whether
the owners will either need or use the new means of supplying
water.                                                      p. 364

The issue of bonds by a county to pay for the construction
cost of a public water supply, a sewerage, or a storm water drain-
age system, is for a public and not a private purpose.     p. 365

The Legislature has power to create a district for the purpose
of local improvements essential to the health and welfare of the
area included, and for the purpose of taxation to pay for such
improvements.                                               p. 365

The Legislature has, under Declaration of Rights, art. 15,
power to provide that the cost of public improvements shall be
defrayed primarily by assessments on abutting properties in the
sub-district in which the improvements are made, and if this
method is insufficient, by a tax on all taxpayers in the taxing
district, and if this is inadequate, by a tax on all the taxpayers
of the political unit of which the district is a part.  pp. 365, 366

*Decided February 11th, 1927.*

Appeal from the Circuit Court for Baltimore County, In
Equity (PRESTON, J.).

Bill by Henry H. Dinneen and Eleanor H. Dinneen, his
wife, to which the Harford Corporation was subsequently
made a party plaintiff, against Harrison Rider and others,

as constituting both the Governing Board of Baltimore County Metropolitan District and also the Board of County Commissioners of Baltimore County, and Thomas C. Hunter, treasurer of Baltimore County. From a decree dismissing the bill, the plaintiffs appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Henry H. Dinneen,* with whom were *Harry M. Benzinger* and *J. Howard Murray,* on the brief, for the appellants.

*George Weems Williams* and *William L. Marbury, Jr.,* with whom were *Elmer J. Cook, David G. McIntosh, Jr.,* and *Charles B. Bosley,* on the brief, for the appellees.

PARKE, J., delivered the opinion of the Court.

The bill of complaint in this case against the Governing Board of the Baltimore County Metropolitan District and the Board of County Commissioners of Baltimore County, and the Treasurer of Baltimore County, the appellees, was filed by the appellants, Henry H. Dinneen and Eleanor H. Dinneen, his wife, for the benefit of themselves and on behalf of all other taxpayers of Baltimore County who would come in and contribute to the cost of the proceedings. The Harford Corporation was made a party plaintiff, and it, with the original complainants, are the appellants from a decree of the chancellor sustaining a demurrer to the bill of complaint and dismissing it with costs to the defendants.

The appellants are taxpayers to Baltimore County and are the owners of real estate situated in what is known as the Metropolitan District of Baltimore County, and seek to have the Act of the General Assembly of Maryland of 1924, known as chapter 539, declared void, and its enforcement enjoined (1) because the act violates article 16 of the Maryland Constitution; (2) because the title of the act is defective and obscure and misleading; (3) because it denies to the appellants due process of law; (4) because it withdraws from the

appellants the equal protection of the law; (5) because the act is confiscatory; (6) because it violates the Maryland Constitution in (a) authorizing the issuance of bonds upon the credit of the county for other than public purposes, and (b) sanctioning double taxation; and (7) because it impairs the obligation of contract between the appellants and Baltimore City.

The act thus assailed erected a specific portion of Baltimore County contiguous to Baltimore City into what was designated as the "Baltimore County Metropolitan District" and placed it under the administration of the members of the Board of County Commissioners of Baltimore County as the Governing Board of the Baltimore County Metropolitan District. The purpose of the legislation is to provide the populous territory of Baltimore County adjacent to Baltimore City with adequate water supply, sewerage, and storm water drainage system. For the accomplishment of these objects, the commissioners are invested with the right to acquire whatever property may be necessary by purchase or through the exercise of the granted power of eminent domain, except that no property may be condemned within the territorial limits of Baltimore City, and, further, that none of the properties, plants, franchises, and rights of the Mayor and City Council of Baltimore now by it owned, or that by it may in the future be acquired for the protection or enlargement of its water supply, sewerage, storm water drainage, or refuse disposal systems, or any other utility property, shall be taken except by and with the consent of the Mayor and City Council of Baltimore. Section 3.

As soon as possible after organization, from time to time thereafter, the commissioners shall cause surveys, studies, plans, specifications and estimates to be made for all those parts of the district in which there is, in their judgment, a need for water supply, sewerage or drainage; and shall divide the district into water, sewerage or drainage sub-districts in such a way as shall in their judgment best serve the needs of the various communities, and shall promote convenience

and economy of installation and operation; and, after such sub-districts have been created, they shall be numerically designated in the order of their creation as metropolitan sub-districts, and shall thereafter be known by the designation so given. Whenever and as plans are completed for those sub-districts most needing service, the commissioners shall give notice, by publication for two successive weeks in one or more newspapers published in Baltimore County, that said improvements are contemplated, that the boundaries of the sub-districts have been established, and the classification provided by section 9 of the act into (1) agricultural, (2) small acreage, (3) industrial or business, and (4) sub-division property has been made, and that at a time specified in the notice, which shall be at least five days after its expiration, any person interested in the improvements will be heard. After public hearing, the decision of the commissioners as to the areas to be included and the improvements to be carried on in any sub-district shall be final. Upon these proceedings, the commissioners are authorized to proceed with the acquisition or construction of water supply, sewerage or storm drainage systems in such respective sub-districts. Section 4.

The act authorizes the proper authorities of Baltimore City to make extensions of water supply lines for and in the district whenever and wherever requested in writing by the commissioners. These extensions are to be paid for by the commissioners, and the cost thereof is subject to review by the Public Service Commission. There is a further provision that the proper authorities of Baltimore City are authorized and directed to make installation of water supply service pipes to be connected to its water mains, whenever and wherever requested in writing by an individual, firm or corporation owning property within the district, provided the applicant shall, before work is begun, deposit with the City of Baltimore a sufficient sum of money to cover such cost of installation, with the right to have reviewed by the Public Service Commission this cost, if the parties disagree. There is a supplementary provision that as soon as such extensions

have been constructed by the City of Baltimore in the district, the operation thereof shall be in the hands of the proper authorities of Baltimore City, which shall maintain and operate the extensions efficiently and establish and collect the water rates, subject to a prescribed control by the Public Service Commission.   Sections 5 and 6.

The commissioners and the proper authorities of Baltimore City and Anne Arundel County are authorized to enter into any agreement with each other with respect to the disposal of sewage or drainage, or with regard to any other matter necessary for the proper construction or operation of the water supply, sewerage or drainage systems under their contract.   Section 7.   The commissioners are required to extend necessary connections from the water main and sewer to the property line of every property abutting upon a street or right of way in which a main or sewer is laid. These extensions for connections are generally to be made at the sole expense of the commissioners.   When the water main or sewer is ready for service, the abutting owners, after notice, may be compelled to connect their premises by completing the extensions on their property, with the exceptions: (a) that no water company shall be required to stop the use of any spring or well used by it to supply its patrons with water fit for domestic use, or cease to supply such patrons with water, or to connect its water supply system with the one established by the commissioners, unless and until the commissioners shall acquire the water supply system and property of the company; and (b) that no property owner having upon his such abutting premises any spring or well supplying water fit for domestic use shall be required to give up the use of such spring or well or to connect his property or premises with, or to take the supply of water for his premises from, the water supply system of the district; and (c) that no property owner having upon his such abutting premises a private sewerage system of a defined type for the disposal of sewage originating on his own premises shall be compelled to abandon it or connect

with the sewerage system of the district, unless not kept in an efficient and working sanitary condition, or unless such connection shall be required by the State Board of Health. It may be observed at this point that a property owner within any of these exceptions is merely relieved of the necessity of accepting the service provided by the district, and paying the charge therefor, but neither expressly nor impliedly does the act relieve him or his property of any assessment or other general charge imposed as a result of the construction, maintenance and operation of the public utility. The service is at his command and his property shares with the other abutting properties in the common benefit of this advantageous and available service, and any exemption of him or his property from the common burden of its installation and upkeep would have been unjustifiable. Sections 8, 5, 6, 4, 9.

The funds necessary for meeting the expenses of the commissioners and for designing and construction, purchase or acquisition of the water supply, sewerage, and drainage systems contemplated, are provided, in the first instance by the commissioners, from time to time, as they may deem necessary, issuing bonds upon the faith and credit of Baltimore County, subject to the provision that the aggregate amount of bonds outstanding for any purpose under the act shall at no time exceed seven *per centum* of the total assessable basis of real and tangible personal property assessed for county taxation purposes within the said Metropolitan District. Section 10. For the purpose of paying the interest on these bonds and providing the sinking fund for their satisfaction at maturity, the commissioners were empowered and directed to raise the necessary money by means of: (a) a reasonable charge for making the connection with the authorized water supply, sewerage, and drainage systems; (b) an annual assessment on all properties, improved and unimproved, bounding upon a street, road, lane, alley, or right of way, in which a water main, sewer, or drain has been built; (c) to the extent the preceding methods are

insufficient to pay the annual amount necessary to discharge the interest on all outstanding bonds for the ensuing year, and to retire all such bonds maturing during the year for which taxes are levied, or to provide a sinking fund sufficient to retire all such bonds as they mature, as the nature of the bonds issued may require, the commissioners shall levy annually against all taxable property in the water, sewerage, or drainage sub-districts a tax calculated and designed to yield a sum adequate to liquidate such deficiency; and, finally, (d) if such a tax so levied shall not produce "a sufficient sinking fund to retire all such bonds as they mature, then the commissioners shall levy annually against all taxable property in Baltimore County a sufficient sum to make up the deficiency." Sections 9, 10.

The act expressly provides the method by which the annual assessment shall be made. It rests upon the theory of benefits conferred upon the property affected. For the purpose of assessing these benefits in the form of a yearly assessment, the commissioners are required to divide all properties fronting upon a street, lane, or alley, in which a water pipe or sanitary sewer is to be laid, into four classes, namely: first, agricultural; second, small acreage; third, industrial or business; and fourth, sub-division property; and the benefit charges shall be fixed and levied in accordance with this classification upon the front-foot basis, and the first payment shall be collectible during the year that the construction is started or in which the systems are purchased or acquired, provided, however, that no front foot benefit charge shall be levied against any property classified as "agricultural" until such property is connected with said water pipe or sanitary sewer, and that, when connected, the length of "agricultural" property to be assessed shall be limited to one hundred and fifty feet. The commissioners are required to change the classification of properties as they change in the uses to which they are put. Section 9.

All assessments and charges shall be uniform for every class of property throughout any sub-district, and all front-

foot assessments shall run for an equal term of years, "provided, however, that any property owner may, at his option, within one year from the time said front foot assessment or benefit charge is levied, extinguish the same by the payment in cash, in one sum, of the proportion of the estimated cost of the project of which the construction abutting upon his property is a part, represented by the number of front feet with which he is assessed, with interest at the rate of six per cent. per annum, from the date of said levy, less any annual payment that may have been made thereon. The commissioners, however, in estimating said cost for the purpose of extinguishment, may add thereto a reasonable margin to protect themselves against possible changes in the cost of construction and the loss of interest." Section 9. These assessments and charges shall be a lien upon the property chargeable with the same until paid, and are payable to the treasurer of Baltimore County and, if unpaid for sixty days after becoming due, they may be collected by the treasurer of Baltimore County by an action of debt or by a bill in equity to enforce the lien. All amounts collected in any manner by such treasurer for the construction, maintenance, and operation of the said water and sewerage systems, after deducting therefrom all overhead expenses of the commission and all proper and necessary costs of maintaining and operating the system, and all such sums so received by the commissioners to the credit of the water and sewerage fund shall be applied by such commissioners to the payment of the interest on and to the retirement of such outstanding bonds as may be issued under this act. Section 9.

The other provisions of the act relate to various administrative, regulatory, and protective measures and details auxiliary to the successful accomplishment of the principal object of the statute, but not in any way involved or helpful in the solution of the questions before the Court, so their statement need not be attempted.

The bill of complaint made the three members of the Board of County Commissioners of Baltimore County, who

are charged with the performance of the new duties imposed
by the act, defendants, as constituting the "Governing Board
of Baltimore County Metropolitan District," but this must
be regarded as a designation of the nature of their additional
powers and duties, as the statute itself does not call into
being any such independent municipal body. The allegations
of the bill of complaint show that the commissioners, after
having obtained in the manner required the data for the
purpose, established a sub-district, which included in its
limits the land of the appellants. The commissioners having
completed its plans for the improvements within this sub-
district, duly gave the prescribed notice of the improvements
contemplated, and that the boundaries of the sub-district had
been established and a classification of the property within
the sub-district, fronting upon a street, lane, or alley, in
which a water pipe or sanitary sewer was to be laid, had been
made into the four classes specified by the act; and that at a
fixed time any person interested in said improvements would
be heard. The appellants did not see the notice by publica-
tion and did not attend the hearing, as they knew nothing of
it. But the public hearing was had, and the commission de-
cided to make the projected improvements, and among them
was the construction of a water main from a point where it
connected with the water supply system of Baltimore City,
near its boundary line, through the sub-district, and laid in
the bed of the two public streets upon which the property of
the appellants abutted. The improvements were completed,
and the commissioners then assessed the whole cost of the im-
provements, according to the prescribed front foot rule, on
all the property abutting on the said improvements, accord-
ing to its several classifications and at these respective rates:

1. Agricultural: 15 cents per front foot for 150 feet only.

2. Small acreage: 15 cents for the first 150 feet; 10 cents
for the next 150 feet; 5 cents for all excess over 300 feet.

3. Industrial or business: 20 cents per front foot.

4. Sub-division property: 15 cents per front foot.

The property of the appellants contains about three acres,

is improved, and is supplied with an abundance of pure water for domestic purposes under contracts existing between the appellants and the Mayor and City Council of Baltimore. The appellants' first actual notice of the action taken was the discovery of a yearly assessment against their property at $92.55 for a period of forty years. This assessment was based on an actual frontage of six hundred and seventeen feet at the rate of fifteen cents per front foot. These facts and the recited provisions of the act present the questions raised.

1. Section 31 of article 3 of the Constitution of Maryland authorizes the General Assembly to declare a law effective from the date of its pasasge, (a) while the subsequently adopted amendment to the Constitution, known as article 16, and entitled "The Referendum," declared by its section 2 that no law should take effect until the first day of June next after the session at which it had been passed, unless the act contained a section declaring the law an emergency measure and necessary for the immediate preservation of the public health or safety, and had been passed upon a yea and nay vote supported by three-fifths of all the members elected to each of the two Houses of the General Assembly. The general scope of this provision, which is indicated in the first sub-section of section 2, is limited by both the express and necessarily implied exceptions which were created by the subsequent terms of this and succeeding sections of the article (b) *Beall v. State,* 131 Md. 673; *Strange v. Levy,* 134 Md. 645, 648; *Poisel v. Cash,* 130 Md. 373; *Richardson v. Blackstone,* 135 Md. 530, 540; (a) *Baltimore v. German-American Fire Ins. Co.,* 132 Md. 380, 383, 384; *Risewick v. Davis,* 19 Md. 82, 96. It is the accepted rule of constitutional construction that the whole of the Constitution is to be examined with a view to arriving at the true intention of every part, so that effect shall be given to the entire instrument and to every section and clause. The seeming conflict betweeen these two articles can be harmonized by accepting the later article as qualifying the earlier article by restricting its operation to those laws not within the purview of article 16. In this

way every word of both will be operative. *Cooley on Constitutional Limitations* (6th Ed.) 72; *Beall v. State,* 131 Md. 669, 679, 680. As stated in the last cited case at page 678, "the general language employed in sections 1 and 2 must be limited and understood to apply only to such legislation as may be capable of referendum under this article."

In ascertaining if the act here assailed is within the purview of article 16, the declaration found in the act that it is an emergency measure is nugatory, if actually the enactment does not come within the terms of that article. *Strange v. Levy,* 134 Md. 645, 648. The act here attacked was made effective from the date of its passage and contained the declaration that it was an emergency law and necessary for the immediate preservation of the public health and safety, and that its passage had been effected in the prescribed mode and by the requisite vote of all the members elected to each House of the General Assembly. The position taken is that the act could not be made effective from its passage, on the theory that the statute changed the salaries and duties of the County Commissioners of Baltimore County, who are public officers, and that this is forbidden by article 16, when it provided that "no measure creating or abolishing any office, or changing the salary, term or duty of any officer, or granting any franchise or special privilege, or creating any vested right, or interest, shall be enacted as an emergency law." Article 16 was designed to reserve to the people of the State, or of Baltimore City, or of any county of the State, the right of having submitted for their approval or rejection any statute or part of a statute passed by the General Assembly. If the act be a general public law, a referendum could not be obtained unless it be requested by a petition signed by ten thousand qualified voters of the State of Maryland, of whom not more than half shall be residents of Baltimore City, or of any one county. Should the act be any public local law for any one county or the City of Baltimore, the petition for a referendum must have the signatures of ten *per centum* of the qualified voters of such county or the City of Baltimore, as the case may be, calculated upon the whole number of votes

cast therein respectively for governor at the last preceding gubernatorial election. Article 16, section 3 (a), (Code, vol. 1, p. 164). The vote to be taken on any referendum would be at the next ensuing election held throughout the State for members of the House of Representatives of the United States. Section 2 (Code, vol. 1, p. 163).

These provisions of article 16 came before this Court for consideration in the case of *Strange v. Levy,* 134 Md. 645. The City of Annapolis had acquired all of the stock of the Annapolis Water Company and owned and operated the company as a public utility pursuant to the provisions of chapter 322 of the Acts of 1904, and chapters 86 and 118 of the Acts of 1912, and, by chapter 205 of the Acts of 1918, the municipality secured an amendment of the company's charter so as to provide *inter alia* for the management and operation of the utility by a board of five directors, composed of designated public officials and the appointees of the municipality. While purporting to be the amendment of a private corporate charter, it was, as is established by its purpose and other provisions, fundamentally a public local law of Anne Arundel County, and it was made effective from the date of its passage, and concluded with the declaration that it was an emergency law and necessary for the immediate preservation of the public health and safety, and that it had been passed conformably to the requirements of the vote required by article 16. The next case was the appeal of *Richardson v. Blackstone,* 135 Md. 530, involving the construction of the provisions considered in *Strange v. Levy, supra.* In this second case, the act was an amendment of the Code of Public Local Laws, article 20, title "Somerset County" and sub-title "Crisfield." See Acts of 1916, ch. 458. The statute in question was chapter 163 of the Acts of 1918, and was passed so as to be effective from the date of its passage as of April 10th, 1918. It did not purport to be passed as an emergency measure.

In both these cases the acts under review were assailed as being violative of article 16 of the Constitution. In the second case cited, it was because the act was made effective

before June 1st, and in the first, it was for the reason that
the statute created a municipal office and changed the salary,
term, and duty of existing municipal offices of Annapolis.
Either statute would have been repugnant to article 16, if
within its purview, but in both cases this Court held section
31 of article 3 of the Constitution applicable, and the statutes
effective as of the dates of their respective passage, on the
express ground that a public local law affecting a political sub-
division of the State, other than Baltimore City or one of the
counties, was not within the operation of article 16. It
would be a manifest incongruity for all the voters of Balti-
more City or of a county to have the right to approve or
reject a public local law affecting and operative primarily
within a limited portion of the territory of either. So, on
the authority of these decisions, it must be held that the
act at bar is not within article 16, since the area constituting
the Baltimore County Metropolitan District is a part only
of Baltimore County. It follows that section 31 of article
3 authorized the Legislature to make the act effective on its
passage.

2. The second point is that the act before the Court
offends the requirement of section 29 of article 3 of the
Constitution of Maryland, that "every law enacted by the
General Assembly shall embrace but one subject and that
shall be described in its title." It has been repeatedly
declared that the title need not give an abstract of the con-
tents of the act, nor need it mention the means and methods
by which the general purpose is to be accomplished. A
liberal construction has been the rule, so as not to destroy
the legislative purpose, and the statutes which have been
held void were usually those whose titles were misleading,
and calculated to lead the Legislature and the public to
believe that the proposed legislation was substantially differ-
ent from what would actually become a law under the body
of the statute.

The act before us is lengthy, but its numerous sections
are germane to the subject matter which is described in
the title. There is nothing enacted which is repugnant to

the title, nor does the title tend to deceive or mislead as to the scope and operation of the legislation. The appellants point out three specific grounds on which they base the argument that the title renders the act unconstitutional. The first ground assigned is that the title does not disclose upon whose credit and by whom the bonds described therein are to be issued and special assessments levied; and the second is that the title fails to state that the duties of the County Commissioners of Baltimore County are materially enlarged and their salaries substantially increased. The title refutes both objections. It put every legislator and the public affected on notice and inquiry by setting forth that the act was "to provide for the issuance of bonds for the purpose of construction" of water supply, sewerage, and storm water drainage systems for the Metropolitan District in Baltimore County created, and "the levy of taxes, assessments and benefits, water and sewer charges and rates for the payment of said bonds; and the operation, maintenance, regulation and control of said system, * * * and to provide that the County Commissioners of Baltimore County shall sit on Monday of each week, and on such days as may be necessary to carry out the provisions of this act, to provide compensation to them for the performance of the duties imposed by this act and for other purposes." Acts of 1924, ch. 539; *Dahler v. Washington Suburban Sanitary Commission,* 133 Md. 644, 649; *Thrift v. Laird,* 125 Md. 55, 69-71.

The third objection interposed is that the title did not disclose the measure was an emergency statute, and made effective on its passage. The sufficient reply to this is that the time the act became effective was not its subject matter, but simply the time when the enactment became operative as a law.

3. The only public hearing provided by the act is the one found in section 4, and every one owning property in any sub-district or interested in the projected improvement is given constructive notice of this hearing, at which the propriety and suitability of the tentative plans are open for discussion, consideration, and revision, with respect to

the area affected, the improvements designed, the several classifications of the abutting property, and the relative apportionment of the front foot rate unit among the four classes of property abutting on the improvements. The nature and scope of the public hearing are broad and comprehensive, since the commissioners' preliminary conclusion is not made until surveys, studies, plans, specifications, and estimates are first before the board for consideration, and these would indicate the probable cost to the properties affected and the length of the line of each improvement, and all would be available to interested parties at the hearing, who could derive therefrom a reasonably close approximation of the final front foot rate. So, all manner of objections, including its cost per front foot to abutting property owners, the unreasonableness of the classification of abutting properties, and the advisability of making the improvement, when its cost would be compared with the benefits to be conferred, could be urged, heard, and decided at the public hearing provided, and it is with respect only to the area to be included and the improvements to be carried out that the decision, after public hearing, is final, since the classification of property is to be changed from time to time, as its uses may be altered. Without determining if the further provision that all charges and the front foot assessment may be collected "by an action for debt or by a suit in equity to foreclose the lien" is sufficient to constitute due process of law, it would seem that any necessity for an adequate and timely notice and hearing is, when weighed in relation to the other provisions of the statute, adequately met by the one specific public notice and hearing required by the act. *Johns Hopkins Bldg. Co. v. Baltimore,* 130 Md. 282, 291; *Monticello Co. v. Baltimore,* 90 Md. 416, 427. And see *Embree v. Road District,* 240 U. S. 242, 244, 251; *St. Louis etc. Co. v. Kansas City,* 241 U. S. 419, 430, *Beale v. Takoma Park,* 130 Md. 297, 309-310; Acts of 1906, ch. 18, secs. 40A-42.

This conclusion is fortified by the fact that the matters

in which the commissioners have a discretion may be made the subject of contention and decision at the public hearing provided by the law, since the method of providing payment of the interest and principal of the bonds issued is mandatory. The mandatory nature of the method prescribed is inherent in the fiscal duties imposed by sections 9 and 10. Section 9 declares that "for the purpose of paying the interest and providing the sinking fund for the bonds issued by the County Commissioners as hereinafter provided for the water supply, sewerage systems to be constructed, purchased or established under this act, the commissioners are hereby empowered and directed to establish a proper and reasonable charge for connection with said water supply, sewerage and drainage systems so to be constructed, purchased or established as aforesaid, and to fix an annual assessment on all properties, improved and unimproved, binding upon a street, road, lane, alley or right of way in which a water main, sewer or drain has been built," and that said annual assessments shall be made upon the front foot basis, and run for an equal term of years. The probable sum to be realized from a reasonable charge for a connection with the utility to be constructed through any sub-district would be calculable on the basis of experience of similar systems, with but a slight margin of inaccuracy, so the amount to be raised by an annual assessment on a front foot basis through a definite period of years could be, for all practical purposes, definitely fixed. And section 10 only authorizes: (a) a levy upon the taxable property in the subdistrict for the payment of the interest and the obligations under the bonds issued to the extent of the insufficiency of the funds produced by the front foot assessment and the connection charges to meet the obligations imposed by the bonds issued; and, in the contingency only of these resources being insufficient to provide a sufficient sinking fund to retire all such bonds as they mature, (b) a levy upon all taxable property within Baltimore County sufficient to make good the deficiency. It is furthermore significant that if a

property owner should desire to extinguish the lien of this front foot assessment by anticipating the yearly instalments payable throughout a term of years, through a present single payment in cash, section 9 determines the sum necessary to be "the proportion of the estimated cost of the project of which the construction abutting on his property is a part, represented by the number of front feet with which he is assessed, with interest at the rate of six per centum per annum from the date of said levy, less any annual payment that may have been made thereon. The commissioners, however, in estimating said cost for the purpose of extinguishment, may add thereto a reasonable margin to protect themselves against possible changes in the cost of construction and loss of interest. When all these provisions are considered, it is clear that a fair and reasonable construction makes it mandatory upon the commissioners to collect the entire cost, less the relatively insignificant amount receivable on account of the connection charge, by the front-foot assessment. The entire cost thus to be met is known to a reasonable degree of certainty, and the number of feet of frontage of the abutting properties, as classified with respect to the fourfold division required, is known, and, therefore, the rates per linear foot of the yearly assessment to be made throughout the period to end in the maturity of all the bonds issued is a matter of comparatively simple mathematical calculation, in which there is no element of discretion and no justifiable issue.

When its provisions ultimately reduce the fixation of the rate to the application of mathematics to known quantities, the Legislature has prescribed the rates of assessment per front foot as effectively as if they had been specified in the enactment. The justification for such a special assessment is the benefit to the property upon which the assessment is laid, and it is presumed that the Legislature considered the purposes for which it authorized the assessment not only a public one, but also one which would be of special benefit to the property upon which the assessment is to be laid in proportion

to its frontage. As this special benefit is particular to every property abutting on the improvement, it thereby becomes also general in its extent by reason of the universality of its operation upon all the properties in the area effected. Because of this double aspect, the common benefit may be measured by the standard of the number of feet fronting upon the improvement, and so the weight of authority and of reason supports the rule as stated by this Court in *Bassett v. Ocean City,* 118 Md. 114, where it was said: "According to the rule established by these recent decisions, the Legislature may apportion the cost of improvement of a street or avenue among the owners of the abutting property according to the front foot rule, and this rule is in accord with the decisions in this state prior to the case of *Ulman v. Baltimore, supra,* which, as applied to an apportionment by the Legislature, have not been overruled. In the case of *Baltimore v. Johns Hopkins Hospital, supra,* Judge Miller said: 'It is conceded, on all sides, to be the province of the Legislature to prescribe, in such cases, how the apportionment shall be made, and this may be either by the front foot, by the area of the fronting lots, or by their value, including or excluding the buildings upon them. Occasional hardships may result from the adoption of either mode, but the authorities are united in the conclusion that either may lawfully be made the basis of apportionment.' " At p. 123. The judgment of the Legislature, viewing the problem as a whole, was that, in view of the benefits to be conferred, the cost of the authorized public improvements, less a reasonable charge for the connection of the abutting property owners with the utility, should be paid by the abutting property owners in the manner set forth in the law in accordance with their respective frontage on the improvements, and the embodiment of this judgment in a statute, so as to make this form of assessment operative without a hearing, after notice, afforded the several affected abutting property owners, is neither taking private property without due process of law under the Fourteenth Amendment of the Constitution of the United States (a), nor under any guaranty of our own Constitution (b). Nor is the reckoning

of the amount on the basis of the two fronts of the property
here involved improper, since the improvement is laid on both
fronts of a corner lot (c), nor can it be said that the assess-
ment for an amount not in excess of the cost of the improve-
ment thus imposed at fifteen cents a front foot, amounting to
an annual charge of $92.55 for a period of forty years on a
property assessed at $8,775.00, is so clearly a flagrant abuse
of legislative power as to constitute an arbitrary deprivation
or confiscation of the abutting owner's rights of private prop-
erty (d). The reasons for these conclusions are apparent and
for their fuller statement reference may be had to the author-
ities here cited. (a) *Wagner v. Leser,* 239 U. S. 207; *Lyon
v. Hyattsville,* 125 Md. 306, 312, 313; See *Dillon on Mun.
Corp.* (5th Ed.), ch. 28, for an exhaustive and able discussion,
particularly, secs. 1432, 1434, 1436; *Houck v. Little River
Drainage District,* 239 U. S. 254; *Hancock v. Muskogee,* 250
U. S. 454; *Browning v. Hooper,* 269 U. S. 396; *Valley Farms
Co. v. Westchester,* 261 U. S. 155. (b) *Bassett v. Ocean
City,* 118 Md. 114, 120-123; *Baltimore v. Johns Hopkins,*
56 Md. 1; *Hyattsville v. Smith,* 105 Md. 318; *Leser v. Wag-
ner,* 120 Md. 671; *Withnell v. Ruecking Constr. Co.,* 249 U.
S. 63; See *Baltimore v. Ulman,* 79 Md. 469; *Dillon,* sec.
1437; *Johns Hopkins Bldg. Co. v. Baltimore,* 130 Md. 282.
(c) *Dillon, supra,* sec. 1437, p. 2529, col. 2 of note, "Cor-
ner lots," and *infra;* See *Beale v. Takoma Park,* 130 Md.
297, 311. (d) *Supra,* and *Dillon, supra,* secs. 1442, 1443,
1446. Compare *Cooley on Taxation* (4th Ed.), secs. 1788,
1789. See *L. R. A.* 1917D, 365-377.

4. The further points are made that the enactment de-
prives the appellants of the equal protection of the law and
impairs the obligation of a contract between them and Balti-
more City. These points are based upon the fact that the
appellants were and are supplied on their premises with an
abundance of good water through a prior existing pipe line
connecting their property with the mains of the Baltimore
City water system, and on the theory that, by section 8 of the
act, property owners similarly situated as the appellants are
obliged to abandon their subsisting supply from Baltimore

City and take their water from the commissioners, while this is not required of those obtaining their water supply from a well or spring on their own premises or from any water company, whether incorporated or not, unless and until the commissioners acquire the water supply system of such company; and that those consumers of the sub-district, taking water from Baltimore City, under the conditions specified in the statute, are alone protected as to the cost of the construction and the reasonableness of the rates by supervisory control and regulation of the Public Service Commission. In the first place, these provisions are subsidiary and designed to adapt the measure to existing conditions, and, in effect, they provide classifications, which are in no sense arbitrary or unreasonable, as they are based upon obvious conditions inhering in each class and justifying the classification; and are, moreover, equal and uniform in their universal application to all falling within the classes created. *Grossfield v. Baughman,* 148 Md. 330, 335, 336. As pointed out by the appellees, Baltimore City is a separate political unit, and so the residents of the sub-district in a different political unit, depending upon Baltimore City for their water supply, should reasonably be given protection, which could not be afforded them by their own county, by the accorded supervision of the Public Service Commission. The foundation for the other classifications is even more plain. *Mogul v. Gaither,* 142 Md. 380, 388. In the second place, the statute does not, in our judgment, affect the right of the appellants to get their supply of water from Baltimore City so long as that municipality is willing to continue its service under its present contract, so there is no impairment of a contract within any constitutional sense. Sections 5, 8. The fact that the appellants are given another source of supply in no way impairs their right to continue to use their original source; and the rule justifying the assessment of the proportionate cost of the improvement upon their abutting property does not depend upon whether or not they either need or will use the new means of supplying water. *Bassett v. Ocean City,* 118 Md. 114, 119;

*Mitchell v. United States,* 267 U. S. 341; *Valley Farms Co. v. Westchester,* 261 U. S. 155, 162.

5. The final grounds of challenge to the validity of the act are that it authorizes the issuance of bonds for a private purpose, and subjects the property to double taxation to provide for their payment. The issuance of bonds to pay for the construction cost of a public water supply, a sewerage, or a storm water drainage system is undoubtedly for a public purpose. It is likewise unquestionable that the Legislature has the power to create a district for the purpose of local improvements essential to the health and welfare of the area included, and for the purpose of taxation to pay for such improvements in whole or in part. *Dahler v. Wash. Sub. San. Commn.,* 133 Md. 644, 648.

The Declaration of Rights declares that "all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the counties and by the City of Baltimore for their respective purposes, shall be uniform as to land within the taxing district, and uniform within the class or sub-class of improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy." Article 15. *Daly v. Morgan,* 69 Md. 460; *Leser v. Wagner,* 120 Md. 671. It is difficult to see how, under this provision, the Legislature has not the power to provide that the cost of the public improvements shall rest primarily on the abutting properties of the taxpayers of the sub-district in which the improvements are made, through the imposition of an assessment of its cost upon such properties; and, secondly, if this method be insufficient, by a tax upon all the taxpayers in the entire taxing district; and, thirdly, if these resources prove inadequate, by a tax upon all the taxpayers of the political unit of which the district is a part. The first mode is an assessment imposed on a class deriving a special benefit from the improvements by reason of the advantageous location of their property with reference to said improvements; and the second is a local tax upon a class owning all the taxable property within the sub-district; and the third is a general tax upon a class

owning all the taxable property within the political unit or
county out of which the district is carved. The first assess-
ment rests upon the theory of benefit, and is substantially
different in kind from the taxes imposed by the second and
third methods. The appellants concede that the first two
methods are approved in *Welch v. Coglan,* 126 Md. 1, 13,
and it may be said it is within the discretion of the Legisla-
ture to provide that the payment of any deficit resulting from
the inadequacy of the first two methods should be met by
general taxation throughout the entire county. See *Dahler v.
Wash. Sub. San. Commn.,* 133 Md. 644, where chapter 122,
Acts of 1918, was sustained. By this act the first two
methods were authorized and the third by implication, as the
bonds issued for the improvements in that Sanitary District
were required to be guaranteed by the counties of Montgomery
and Prince George's, and this guaranty would have to be met
by a general tax on all the property in the two counties.

The three classes of taxpayers in the instant case are not
contributing to the same burden twice, as each burden is a
distinct one and is imposed on each class as the result of
separate and different causes. The first class derives a
particular or private benefit from the ownership of the
abutting property; the second, a general or indirect benefit
from the ownership of property within the sub-district; and
the third has the remoter local or political interest of all
the taxpayers in the general public welfare of the county
as enhanced by public improvements in any of its parts
and the obligation to discharge in full and in good faith the
authorized indebtedness of the county. We can perceive
no sound reason why the method here adopted is ill-advised,
much less unconstitutional. *Thrift v. Laird,* 125 Md. 55,
69; *Houck v. Little River Drainage District,* 239 U. S.
254, 262; *Ludwig v. Baltimore County,* 131 Md. 351;
*Valley Farms Co. v. Westchester,* 261 U. S. 155; *Curtis v.
Mactier,* 115 Md. 386; *Leser v. Wagner,* 120 Md. 671;
*McGraw v. Merryman,* 133 Md. 247; *Leser v. Lowenstein,*
129 Md. 244.

Without further prolonging this opinion by pointing out in detail why we consider the numerous cases cited by the appellants as not sufficient in weight and point to cause us to reach a different result, it will suffice to say all have been given serious attention and our best judgment is that, for the reasons stated, the decree of the chancellor must be affirmed.

*Decree affirmed, with costs.*